IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Ray Buckhannon,                              :        Case No. 3:08CV0757

     Plaintiff,                              :

vs.                                          :

Commissioner of Social Security             :        **MEMORANDUM DECISION**
Administration,                                         **AND ORDER**

     Defendant.                              :


Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the Appeal's Council's final

determination denying his claim for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.

S. C. §§ 1381 *et seq*.  Pending are issues arising from the Briefs of the parties (Docket Nos. 18 and 21).  For

the reasons set forth below, the Commissioner's decision is affirmed.

**PROCEDURAL BACKGROUND**

Plaintiff Ray Buckhannon filled applications for disability insurance benefits (DIB) under Title II

of the Social Security Act, 42 U.S.C.. §§ 416 (i) and 423 and SSI on August 10, 2004,  alleging disability

beginning on April 1, 1993  (Tr. 58-61, 307-310).  His previous application for SSI, filed on April 24, 200l,

was denied on September 23, 2003 and is not before the court for judicial review (Tr. 74-83). His  SSI and

DIB applications, filed during 2004,  were denied initially and upon reconsideration (Tr. 29, 30, 312-314,

316-318).   Plaintiff  requested a hearing before an administrative law judge (ALJ) and his case was heard

before ALJ Mark M. Carissimi on June 28, 2007 (Tr. 46, 31-35).  During the hearing, Plaintiff requested

and was permitted to withdraw his claim for DIB.  Plaintiff  and Vocational Expert Ted S. Macy testified

at the hearing (Tr. 319-362).

On September 20, 2007, the ALJ rendered an unfavorable decision denying Plaintiff's claim for SSI

(Tr. 13-21).  Upon denial of review by the Appeals Council, the ALJ's decision was affirmed rendering it

the final decision of the Commissioner (Tr. 4-6).  Plaintiff then filed a timely action in this Court seeking

judicial review of the Commissioner's final decision.

### FACTUAL BACKGROUND

*The Plaintiff's Testimony*

Mr. Buckhannon was born March 28, 1953 (Tr. 307) and completed the twelfth grade[1] (Tr. 89).  He

is 6'3" and weighs 250 lbs, (Tr. 348).  Plaintiff testified that he was employed in 1992 or 1993 as a tree

trimmer[2].  He worked one day, about 4 years ago and dislocated his shoulder (Tr. 326-327).  Later, he

---

[1]

The prior ALJ's decision found that although the plaintiff has a high school education, he was in special education classes and is illiterate (Tr. 82).

[2]

In the Disability and Function Reports, Plaintiff stated that injuries related to the fall in 1993 prevent hun from working (Tr. 85).  Because of his problem with his legs, shoulders, and wrist, he reported being limited in his abilities to lift, stand, walk, sit, climb stairs, kneel, squat, reach and use his hands (Tr. 104).  Plaintiff also noted that he suffers from mental stress, depression, violent mood swings, irritability and short temper (Tr. 95, 103, 105).  He reported having problems paying attention, receiving "LD tutoring" all through school and being easily

worked part-time for a concrete company driving a Bobcat®, backhoe or truck and trailer (Tr. 327-328). The physical part of the job included unhooking the trailer from the truck (Tr. 330).  At must, he lifted up to twenty pounds (Tr. 331).  In 2006, Plaintiff was temporarily employed by an agency for two days driving a job truck" (Tr. 332, 333).

Plaintiff was unable to work due to injuries to his left wrist and thumb, collarbone, left shoulder, right leg, knee and calf, left foot and heel and right hip (Tr. 338-339).  Because he had no medical insurance, Plaintiff stated that the only treatment he received was from the emergency room (Tr. 341).  Plaintiff took over-the-counter medications as the emergency room only provided temporary prescriptions and the health department provided only non-narcotic pain medications (Tr. 342).  When discussing his mental status, Plaintiff testified that he does not like to be around people and described himself as sitting around "losing his marbles" (Tr. 348).  Plaintiff further testified that the average amount of time he could sit in one place varied  from twenty to thirty minutes (Tr. 343).  When asked how long he could stand at one time, Plaintiff estimated  from ten to fifteen minutes (Tr. 343).  He further stated that out of the week, he has two good days that he can move around (Tr. 344-345).

The VE's Testimony

The ALJ posed a hypothetical to the VE that assumed an individual of Plaintiff's age, education, and work experience and limited to sedentary work (lifting ten pounds occasionally and five pounds frequently; standing and walking two hours of an eight hour day); standing and walking limited to 30 minutes at a time with five minutes of sitting before resuming standing and walking; no pushing or pulling; no operation of

---

distracted (Tr. 104).

foot controls; no overhead reaching; no climbing, kneeling, crouching or crawling; occasional stooping; no frequent repetitive gross use of the left hand or arm; no exposure to extreme heat or cold temperature or high humidity, fumes, dust or chemicals, limited to simple, repetitive one-to three-step job tasks; and limited to jobs that could be demonstrated by physical demonstration and require minimal reading (Tr. 358-359).

The VE testified that such individual could not perform Plaintiff's past relevant work but could perform work as a bench assembler, wire worker and final assembler (Tr. 359-360).  If the hypothetical individual were unable to sustain employment on a regular, full-time basis and would be off task 20 percent of the time, the VE testified that there would be no competitive jobs for that individual as most employers would not be able to tolerate the limitations (Tr. 361).

The VE further  testified about the type and number of jobs available for someone able to perform sedentary work, based on Plaintiff's limitations.  "Bench assembler is normally a light, unskilled job, but I'm going to give you those really that would really fall in the sedentary range based on your limitations. [T]he DOT number is 706.684.022.  It's an unskilled job.  The numbers we'd have here for northeast Ohio would only be able 400 jobs.  [W]ithout all the limitations you gave, we'd be looking at about 1,200.  [W]e, nationally, we'd have about 70,000 of those jobs.  [A]nother example would be a job such as a wire worker. A wire worker's also an unskilled production-type job.  [T]he DOT number for that job is 728.684-022.  In northeast Ohio about 500.  Without the reduction based on all the limitations you gave, there'd be about 1,500.  [N]ationally there'd be about 70,000 within the limitations you've given.  A third example, [w]ould be a job such as a final assembler.  A final assembler is also unskilled.  It's a sedentary job, and within the limitations, and the DOT number for that [i]s 713.687-018.  In northeast Ohio there'd be about 700 jobs,

across the country, about 100,000 jobs" (Tr. 359-360).

## MEDICAL EVIDENCE

**1.      Claudet Smith, Medical Doctor (M.D.)**.

During a consultative examination of Plaintiff conducted on November 2, 2004, Plaintiff related his

history of problems beginning with an injury in high school which required hamstring surgery with

extensive calf repair resulting in chronic pain (Tr. 185-190).  He  reported injuries sustained after falling

from a roof in 1993 which included fractures of his left wrist and thumb and right humerus with recurrent

dislocations of both shoulders afterward (Tr. 185).  He complained of pain daily through his body which

he tried to relieve with his mother's pain medication and by drinking alcohol (Tr. 185).  Based on her

examination, Dr. Smith concluded that Plaintiff 's ability to walk sometimes would be limited because of

chronic pain on the right side where he had the remote history of accident and surgical repair and that he

would have trouble bending and lifting because of ongoing shoulder pain as he did have significant

decreased range of motion especially at the left shoulder (Tr. 186, 188-189).

**2.      Rebecca R. Neiger, Medical Doctor (M. D.).**

In the physical residual capacity assessment completed on November 19, 2004. Dr. Neiger opined

that Plaintiff was limited to lifting and/or carrying  50 pounds occasionally, to lifting and/or carrying 25

pounds frequently, to standing and/or walking about six  hours in an 8-hour workday, to sitting about six

hours in an 8-hour workday, to climbing ramps/stairs occasionally (and never ladder/rope/scaffolds), to

crawling occasionally and to reaching in all directions (including overhead) occasionally on the left side

based on his history of injuries, numerous recurrent shoulder dislocations, significant pain and decreased

range of motion in the left shoulder (Tr. 191-198).  Additionally, Dr. Neiger stated that, "The symptoms expressed by the claimant are attributable to a medically determinable impairment and are consistent with the medical evidence.  However, the degree to which the claimant states his conditions limit him are somewhat exaggerated.  Therefore the claimant's statements are considered  partially credible." (Tr. 196).

**3.      Ronald G. Smith, Ph.D.**

Plaintiff underwent a consultative psychological examination performed by Dr. Smith on April 13, 2005, during which Plaintiff related his school history of repeating the third grade, receiving learning disabilities (LD) tutoring from the fourth year on, having poor reading skills and having problems paying attention (Tr. 211-214).  Dr. Smith noted that Plaintiff tended to make seemingly irrelevant references during the course of the examination (Tr. 212). Plaintiff described having a terrible mood with severe fluctuations, having crying spells a few times a week, feeling anxious with chest heaviness and sweating when overwhelmed, experiencing nightmares about two to three times a week and feeling depressed (Tr. 212-213).  Dr. Smith suggested DSM-IV diagnosis on Axis I of adjustment disorder with mixed emotional features and on Axis II of borderline intellectual functioning (estimated) (Tr. 214).  He opined that Plaintiff's ability to maintain attention and concentration would appear to be fairly good except when overcome by pain or discomfort, his ability to follow simply one or two step job instructions would be fair but probably limited on a cognitive basis and his ability to relate to the public, coworkers and supervisors would be likely compromised because of his admitted "grouchiness," low morale and low frustration tolerance (Tr. 214).

**4.      Mental Residual Functional Capacity Assessment (MRFCA)**

Robert Gaffey completed a MRFCA on April 29, 2005 (Tr. 229-231), opining that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting (Tr. 229-231).  He stated that Plaintiff would be capable of performing one and two step tasks, would be moderately limited in performing multistep instructions and could perform a forty hour work [week] of simple, routine, tasks without strict time restraints or production quotas (Tr. 231).

**5.      Fisher Titus Medical Center**

To treat right hip pain, Plaintiff was prescribed Vicodin, ice packs, and bed rest on July 1, 1996 (Tr. 151).  Plaintiff's left shoulder was considered dislocated on July 8, 1998 (Tr. 149).

On August 10, 2000, Plaintiff was diagnosed with a dislocated shoulder.  He was prescribed Vicodin for pain and placed in a shoulder immobilizer (Tr. 147).  Plaintiff was diagnosed with post fracture arthritic process of the left wrist on November 7, 2000 (Tr. 144-145).

Plaintiff was treated for cough induced syncope on May 5, 2001 (Tr. 136-137).  X-rays of Plaintiff's right shoulder taken on August 2, 2001, showed an anterior dislocation.  The shoulder was reduced with traction (Tr. 130-135).  Plaintiff was diagnosed with chronic arthralgia of the right shoulder on September

4, 2001 (Tr. 128-129).  Plaintiff was prescribed Vicodin for tooth pain on November 18, 2001 (Tr. 126-127).

On July 17, 2003, Plaintiff underwent a closed manipulative reduction of the left shoulder (Tr. 116-125, 161).

Plaintiff was diagnosed with a left heel spur on September 8, 2003 (Tr. 180, 183).  Vicodin was prescribed and Plaintiff was advised to elevate his foot, place it on ice and wear extra padding in his shoes (Tr. 184).

Plaintiff was treated for groin pain on February 9, 2004 (Tr. 173-176).

Since the prior ALJ decision, Plaintiff required emergency treatment at least three times for shoulder problems.  In May 2004, Plaintiff was seen after the shoulder had "popped out" and then popped back into place.  It was noted that he had a long history of spontaneous dislocations and was given Vicodin and a shoulder immobilizer (Tr. 166-169).

On January 26, 2005, Plaintiff went to the emergency room complaining of left shoulder pain after having slipped on the ice.  Apparently, he "dislocated his shoulder,  which he relocated."  He was given Percodan for his complaints of pain (Tr. 208).  Plaintiff was presented to the emergency room on January 28, 2005 with abdominal pain.  No active disease, fracture, or dislocation was noted (Tr. 200-201, 204, 205, 206).

Plaintiff visited the emergency room in December 2005 after falling on the ice (Tr. 236-239).  He complained of pain primarily in the right foot and over the greater trochanter of the right hip (Tr. 236).  It was noted that he had previously broken his right foot and has the hamstring of his right thigh repaired.  X-ray of the right foot revealed a nondisplaced cortical fracture involving the medial distal aspect of the first

cuneiform bone with subtle findings raising the possibility of nondisplaced fractures of the bones of the

second and third metatarsal bones with a plantar heel spur (Tr. 237). X-ray of the right hip showed minimal

marginal hypertrophic lipping involving the lateral aspect of the lateral head (Tr. 239).

On October 20, 2006, Plaintiff required reduction of his left shoulder after falling on a wet floor and

dislocating it (Tr. 240-241).

**6.      University Community Hospital, Tampa, Florida.**

Plaintiff was seen in the emergency room on November 16, 2006, for increasing erythema of the left

lower leg below the knee with cellulitis of the tibial region (Tr. 245-306). He was admitted with the

diagnosis of left prepatellar bursitis and treated with a course of antibiotics (Tr. 245).

**7.      Psychiatric Review Technique.**

In the Psychiatric Review Technique form, completed by Robert Gaffey, Plaintiff was diagnosed

with an adjustment disorder with mixed emotional features and borderline intellectual functioning (Tr. 218,

219). The functional limitations that existed as a result of a mental disorder included a mild degree of

limitation in Plaintiff's restriction of activities of daily living and moderate degree of limitation in

difficulties in maintaining social functioning, persistence, concentration and pace (Tr. 225).

## STANDARD FOR DISABILITY

SSI is available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730

(6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920)). "Disability" is defined as

the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A)

(definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI

context)).

The Commissioner's regulations governing the evaluation of disability for SSI is found at 20

C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively:

> First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *[Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir.1990)]. *Id.*
>
> Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant finding of disability.  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities."  *Id.*
>
> Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*
>
> Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*
>
> Fifth, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F. 3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).

If the Commissioner makes a dispositive finding at any point in the five-step process, the review

terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

<u>**ALJ DETERMINATIONS**</u>

After consideration of the entire record, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since August 10, 2004, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe combination of impairments: status post bilateral shoulder

dislocation (Exhibits 1F44, 1F21, 1F5, 2F3, 4F, 10F18, 6F10); status post fracture of the left heel and left heel spurs (Exhibits 3F19, 2F3, 4F); status post right foot fracture (Exhibits 1-F5, 4F); adjustment disorder (Exhibit 7F); and borderline intellectual functioning (Exhibit 7F) (20 CFR 416.920(c)).

3.       The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.       After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform a range of sedentary work.  Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and five pounds frequently.  He can stand and walk for up to 30 minutes at a time and up to two hours total, and he can sit for eight hours total.  The claimant cannot push and pull, operate foot controls, or engage in overhead reaching.  He can never climb, kneel, crouch, or crawl, but can occasionally bend.  There can be no frequent, repetitive gross use of the left non-dominant hand/arm.  The claimant requires a clean air environment with no exposure to hot and cold temperatures, humidity, fumes, dust and chemicals.  The claimant can perform no more than simple repetitive one to three step tasks which can be demonstrated by physical demonstration with minimal reading.

5.       The claimant is unable to perform any past relevant work (20 CFR § 416.965).

6.       The claimant was born on March 28, 1965, and was 39 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR § 416.963).

7.       The claimant has at least a high school education and is able to communicate in English (20 CFR § 416.964).

8.       The claimant did not acquire transferable skills pertaining to his current residual functional capacity in performance of his past relevant work (*See* SSR-82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.       Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in the significant numbers in the national economy that the claimant can perform (20 CFR §§416.960(c) and 416.966).

10.      The claimant has not been under a disability, as defined in the Social Security Act, since August 10, 2004, the date the application was filed (20 CFR 416.920(g)).

(Tr. 15-21).

## STANDARD OF REVIEW

This Court exercises jurisdiction over the review of the final decision of the Commissioner pursuant

to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).  The court's review of the decision of the Social Security Administration is limited by 42 U.S.C. §405(g) which circumscribes a reviewing court to a determination of whether substantial evidence supports the Commissioner's's decision.  *Drummond v. Commissioner of Social Security,* 126 F.  3d 837, 840 (6th Cir. 1997).  In fact, the district court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Social Security Administration,* 402 F.  3d 591, 595 (6th Cir. 2005) (citing *Walters v. Commissioner of Social Security,* 127 F. 3d at 390; Kirk v. Secretary of Health and Human Services,  667 F.2d 524, 535 (6th Cir. 1981)) (internal quotation marks omitted).  If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.  (citing Warner,* 375 F. 3d at 390; *quoting Key v. Callahan,* 109 F. 3d 270, 273 (6th Cir. 1997).

## DISCUSSION

The claims in Plaintiff's Brief and Reply Brief can be consolidated into three arguments.  First, the ALJ erred  by ignoring evidence in the record from Plaintiff's treating physicians.  Second, the ALJ failed to discuss, why he rejected the opinion of the state agency psychologist.  Third, the ALJ erred in his questioning of the VE by not giving a proper hypothetical question.

1.    **THE ALJ'S FINDING IGNORES EVIDENCE IN THE RECORD FROM EXAMINING AND REVIEWING PHYSICIANS.**

In this case, Plaintiff argues that the ALJ ignored evidence in the record from examining and

reviewing physicians; particularly those of Dr. Smith (Ph.D), the consulting psychologist and the reviewing agency's assessment in evaluating residual functional capacity.

In general, an assessment of residual functional capacity describes an adjudicator's findings about the ability of an individual to preform work related activities.  TITLES II AND XVI; MEDICAL SOURCE OPINIONS IN ISSUES RESERVED TO THE COMMISSIONER, SSR 96-5p, 1996 SSR LEXUS 2 (July 2, 1996).  Residual functional capacity is the most a claimant can still do despite his or her limitations. *Stroker v. Commissioner of Social Security,* 2008 WL 1775414 * 6 (N. D. Ohio 2008) (*citing* 20 C.F.R. § 404.1545(a)(3)).  However, before a determination may be made that the claimant is not disabled, the Commissioner is responsible for developing the claimant's complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help the claimant obtain medical reports from the claimant's own medical sources.  *Id.  (citing* 20 C.F.R.  § 404.1545(a)(3)).

The ALJ did not disregard the opinions of the treating physicians, particularly the opinions of Dr. Smith, Plaintiff's psychologist in assessing residual functional capacity. Plaintiff  stated that he was able to arise in the morning, and watch television.  Contrary to his hearing testimony, Plaintiff relayed to Dr. Smith that he was able to mow the lawn and go to the store for his mother.  He stated that his alcohol consumption had decreased, and he was down to one six pack per week, and a 12 pack of beer on holidays.  Additionally, Plaintiff acknowledged smoking marijuana three to four times per day on holiday occasions" (Tr. 19). In his report,  Dr. Smith discussed Plaintiff's daily activities, and  the ALJ considered those activities when making his decision.  Plaintiff was able to go to the store with his mother, mow the lawn, and maintain attention and concentration fairly well as long as he was not overcome by pain or discomfort (Tr. 213-214).

The ALJ took into consideration all the  evidence submitted by Plaintiff's physicians :Plaintiff's

ability to lift certain weights, stand and sit for periods of time and the ability to take some direction, and the non-medical evidence as to Plaintiff's ability to conduct daily activities, such as going to the store and riding the lawnmower.  Based upon this evidence, the ALJ made a finding as to Plaintiff's residual functional capacity.

In addition, Plaintiff argues that in making the residual functional assessment finding, the ALJ failed to consider the state agency assessment.  The Magistrate finds that the ALJ did rely on the state agency assessment adopting the only limitation imposed by the state agency evaluation: Plaintiff would be limited to simple repetitive" one and two step tasks" which can be demonstrated by physical demonstration with minimal reading (Tr. 17, 231).  Plaintiff's first argument has no merit.

**2.     THE ALJ FAILED TO DISCUSS WHY HE REJECTED THE OPINION OF THE STATE AGENCY PSYCHOLOGIST.**

The Magistrate finds this argument, too, lacks merit.  The ALJ did discuss why he rejected the opinion of the state agency psychologist.

Because agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules require ALJs and Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s)as opinions of nonexamining physicians and psychologists.  Policy interpretation ruling titles ii and xvi: consideration of administrative findings of fact by state agency medical and psychological consultants and other program physicians and psychologists at the administrative law judge and appeals counsel levels of administrative review; medical equivalence, SSR 96-6p, *2 (July 2, 1996), ALJs and Appeals Council are not bound by findings made by agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.  *Id.*

In this case, the ALJ did not ignore opinion evidence or fail to explain the weight given the state

agency medical professional.  In fact, he stated, "As for the opinion evidence, I accord the State Agency assessment of the claimant's physical residual functional capacity is not supported by the medical evidence of record.  The record, as a whole, supports a finding that the claimant's multiple shoulder dislocations limit his ability to lift or carry more than 10 pounds occasionally or 5 pounds frequently" (Tr. 20).  The agency psychologist's opinion is different than that of Dr. Neiger (who stated Mr. Buckhannon can lift 50 pounds occasionally and 25 pounds frequently) (Tr. 192).  "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record."

The ALJ further states, "I credit the State Agency assessment of the claimant's mental residual functional capacity at Exhibit 9F, and find it to be wholly supported by the medical evidence of record pertaining to the claimant's mental functioning.  I note that the claimant has not sought mental health treatment, and is able to control his musculoskeletal pain with over the counter medication" (Tr. 20).  Although the state agency psychologist's opinion is similar regarding Plaintiff's mental health treatment,, Plaintiff did not make the effort to seek medical treatment regarding this matter.  In addition to this, Plaintiff, although at times given prescription medication with his emergency room visits, is still able to tolerate his pain by using over the counter medications (such as Motrin).  The ALJ, therefore, determined that  Plaintiff  was able to perform sedentary work.

**3.      THE ALJ ERRED IN GIVING A PROPER HYPOTHETICAL QUESTION TO THE VE.**

Plaintiff claims that the hypothetical questions posed to the VE are not an accurate description of all of his physical and mental impairments resulting from the opinions from the consulting psychologist and reviewing agency assessments.

An ALJ may rely upon a VE's testimony in response to a hypothetical question.  20 C.F.R. §§

404.1560(b)-(c) (Thomson Reuters/West 2008).  In fact, the VE's testimony may constitute substantial evidence where the testimony is elicited in response to hypothetical question that accurately sets forth the plaintiff's physical and mental limitations.  *Webb v. Commissioner of Social Security,* 368 F. 3d 629, 633 (6th Cir. 2004) (*citing Foster v. Halter,* 279 F, 3d 348 (6th Cir. 2001)).

The ALJ found that the limitations posed by Dr. Neiger were not supported by the medical evidence in the record (Tr. 20).  Thus, the ALJ was not required to include such limitations in the hypothetical posed to the VE.  The ALJ, however, did take into account Dr. Smith's mental assessment when posing the hypothetical question to the VE (Tr. 231, 358).  The ALJ did incorporate the opinion of Plaintiff's consulting psychologist in the hypothetical to the VE, and the magistrate concludes that such hypothetical question was properly given.

**CONCLUSION**

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Dated: April 3, 2009